IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiffs, | **8:21CR284** |
| vs. | |
| LORENZO GONZALEZ-PEREZ, | **FINDINGS AND RECOMMENDATION** |
| Defendants. | |

This matter is before the Court on Defendant Lorenzo Gonzalez-Perez's Motion to Suppress Evidence and Statements ([Filing No. 203](#)). An evidentiary hearing was held on this matter on September 19, 2022. Post hearing briefs were submitted. A transcript has been filed and the motion is ready for disposition.

For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

On October 18, 2021, at approximately 9:00 p.m., Utah State Trooper Skyler Harwood ("Trooper Harwood") was on patrol near milepost 18 on I-70 in Sevier County, Utah. (TR. 5.) Trooper Harwood testified that milepost 18 is about 18 miles from where I-70 comes off Interstate 15. (TR. 5.) It is a two-way road divided by a dirt median. (TR. 5.) Trooper Harwood testified that the roadway is not large. (TR. 7.) Trooper Harwood stated the area is a canyon with a downhill slope in a rural part of the state. (TR. 5.) Trooper Harwood testified that at that time of night during that part of the year, the traffic in the area is light. (TR. 5.) Trooper Harwood stated it is

very dark in the area and the speed limit is 75 miles per hour. (TR. 5-6; TR. 35.) Trooper Harwood testified this area is known for drug trafficking. (TR. 39.)

Trooper Harwood, who is a trooper and K-9 handler, has been with the Utah Highway Patrol for ten years and a K-9 handler for approximately four years. (TR. 4.) Trooper Harwood's work includes normal traffic stops, but also focuses on criminal interdiction, which includes elements of criminal behavior, such as fraud and drug smuggling. (TR. 4.) Trooper Harwood testified he has conducted thousands of traffic stops for window tint violations. (TR. 46.) He also stated he has conducted hundreds to thousands of traffic stops for failure to illuminate license plates. (TR. 46.) On the evening in question, Trooper Harwood was focusing on criminal interdiction and looking for guns on the roadways. (TR. 5.) Trooper Harwood had his certified K-9 with him in his cruiser. (TR. 21; Ex. 1; Ex. 2.)

While on patrol, Trooper Harwood observed a red Dodge Charger. (TR. 7.) When he first observed the Charger, he was sitting stationary in his cruiser around milepost 18. (TR. 7.) Trooper Harwood could not recall whether he was sitting parallel or perpendicular to the roadway. (TR. 7.) Trooper Harwood testified he was able to see the Charger for approximately ten seconds as it came toward him and about that same amount of time as it was pulling away from him. (TR. 7.) Trooper Harwood stated he observed that the taillights on the Charger were working, but that it appeared everything else on the Charger was blacked out. (TR. 8.) He testified that all he could see was the taillights. (TR. 8.) Trooper Harwood testified he could not read the rear license plate. (TR. 8.) Trooper Harwood stated that as the Charger went by him, he noticed it had dark window tint and that the rear license plate light appeared not to be working. (TR. 8.) Trooper Harwood testified he had a couple of seconds to determine if the window tint was in violation as the Charger passed him. (TR. 36.)

Trooper Harwood testified he was not 100% positive he saw both those violations at that point. (TR. 8.) Trooper Harwood stated he believed he had probable cause for a traffic stop based on the license plate illumination, but he wanted to double-check to see whether there was a tint violation. (TR. 34.) Trooper Hardwood testified that if he suspects a traffic violation at night, he oftentimes drives a little closer to the vehicle to confirm the violations before he makes the traffic stop to give the public the benefit of the doubt. (TR. 8-9.)

Trooper Harwood testified that once the Charger passed him, he pulled out on the roadway into the left-lane and moved parallel to the vehicle. (TR. 9; TR. 37.) Trooper Harwood said he was traveling in the left lane so he could take a second look at the window tint. (TR. 9; TR. 37.) Trooper Harwood acknowledged on cross-examination that he did not get exactly parallel to the Charger and could have been closer to the back left wheel of the vehicle.[1] (TR. 37; Ex. 2.) Trooper Harwood testified that he was close enough to the Charger to confirm that the window tint was too dark under Utah law. (TR. 9; TR. 37.) Trooper Harwood testified that when he started following the Charger, the license plate lamp appeared to be working. (TR. 32; Ex. 8.) Trooper Harwood stated he was only able to read the plate when he was behind the Charger because of the headlights of his cruiser. (TR. 34-35.) Trooper Harwood stated one way to verify whether a license plate light on a vehicle is on is to turn his cruiser's headlights off and on, but he did not do so in this case. (TR. 37-38.)

Trooper Harwood testified that his understanding with respect to illumination of license plates is that plates need to be illuminated enough so a person can clearly read the numbers and letters. (TR. 10.) During the hearing, Trooper Harwood was shown a copy of the applicable Utah statute dealing with illumination of license plates. (TR. 29-30; Ex. 101.) Trooper Harwood acknowledged that the statute does not contain anything specific about an individual following a vehicle having to be able to see the license plate. (TR. 30.) Trooper Harwood testified that he believed that the license plate did not comply with Utah law. (TR. 41.) Trooper Harwood testified that that in October, 2021, window tint had to permit forty-three percent light transmittance through the front side windows of a vehicle. (TR. 11.) Trooper Harwood stated the law has since changed to allow for more window tint. (TR. 11.)

After confirming the window tint violation, Trooper Harwood slowed his cruiser to allow the Charger to go by him and then turned on his emergency lights to conduct a traffic stop. (TR. 10.) At the time of the stop, Trooper Harwood was wearing a body camera which recorded the traffic stop. (Ex. 1.) Trooper Harwood also had a dash camera on his cruiser which captured the stop. (Ex. 2.) Trooper Harwood exited his cruiser, approached the passenger side window of the Charger, and noted there were two occupants. (TR. 13; Ex. 1.) Trooper Harwood identified the driver and owner of the vehicle as Giovanna Cisneros ("Cisneros"). (TR. 14.) Defendant was in

---

[1] The video, Exhibit 2, shows that Trooper Harwood was more than at the back left wheel of the vehicle.

the front passenger seat. (TR. 14; Ex. 1.) Trooper Harwood informed them that they had been stopped because the Charger did not have an illuminated license plate and the window tint appeared too dark. (Ex. 1; TR. 14.) Trooper Harwood asked Cisneros for her driver's license and proof of insurance. (Ex. 1; TR. 14.) Cisneros produced a Nebraska identification card and told Trooper Harwood that she had a driver's license, but that it was lost. (TR. 14; Ex. 1.) Trooper Harwood asked Defendant if he had a driver's license. (Ex. 1.) Defendant responded he did not. (TR. 14-15; Ex. 1.) Trooper Harwood asked Cisneros to come back to his cruiser so he could address the traffic violations and check the status of her driver's license. (TR. 15; Ex. 1.)

In the cruiser, Trooper Harwood removed his body camera and placed it on the dash facing toward Cisneros, who was sitting in the front passenger seat. (TR. 15; TR. 19; Ex. 1.) Trooper Harwood asked Cisneros her name, birthday, address, and other identifying information. (TR. 16; Ex. 1.) He provided the information to dispatch to run a records check. (TR. 16; Ex. 1.) Trooper Harwood asked Cisneros about her travel plans. (TR. 18; Ex. 1.) She said they left Omaha to go to California to visit friends four to five days prior. (Ex. 1.) She indicated they stayed with her uncle for two nights. (Ex. 1.)

Trooper Harwood exited his cruiser and went back to the Charger to check the window tint on the front passenger door window with his tint meter. (TR. 16-17; Ex. 1.) Trooper Harwood explained that a tint meter is a small handheld electronic device that consists of two pieces. (TR. 16.) Once piece is reflective and the other piece shoots a laser onto the reflective piece. (TR. 16.) The laser shoots through the glass of the window to determine the light percentage transmitted. (TR. 17.) Trooper Harwood testified that before using the meter, it must be calibrated and that he calibrates the meter every time before he performs a tint test, including on the date in question. (TR. 17.) Trooper Harwood stated that he has utilized a tint meter to confirm tinting thousands of times in his career. (TR. 42.) Defendant was in the vehicle at the time Trooper Harwood conducted the tint test. (TR. 17; Ex. 1.) While performing the test, Trooper Harwood spoke to Defendant about their travel plans. (TR. 17-18.) Trooper Harwood testified that he noted the discrepancies between what Defendant and Cisneros told him about their travel plans. (TR. 18.)

After checking the tint and speaking to Defendant, Trooper Harwood went back to his cruiser to speak to Cisneros. (TR. 18.) Trooper Harwood radioed for assistance and requested that Utah Highway Patrol Trooper TyRell Bagley ("Trooper Bagley") respond to the scene. (TR. 18;

4

TR. 49; Ex. 1.)  Trooper Harwood told Cisneros than the window tint on her vehicle was 33% and that Utah law required 43% light transmittance.  (TR. 25; Ex.2.)  Trooper Harwood was told by dispatch that Cisneros' driver's license was suspended.  (TR. 19; Ex. 1.)  Dispatch also reported that Cisneros had eight arrests and charges for traffic violations, theft, receipt of stolen property, impersonation, and possession of marijuana and methamphetamine. (TR. 20; Ex. 1.)  Trooper Harwood had also received a Nebraska identification card from Defendant and ran Defendant's information through dispatch.  (TR. 20.)  Trooper Harwood learned Defendant did not have a valid driver's license.

Trooper Bagley arrived on the scene and Trooper Harwood explained what was going on and told Trooper Bagley that he was going to deploy his K-9.  (TR. 21; Ex. 1.)  Trooper Harwood asked Trooper Bagley to stay with Cisneros while he conducted the K-9 sniff.  (TR. 21; Ex. 1.)  Trooper Harwood returned to the Charger and asked Defendant to step out.  (Ex. 1.)  Trooper Harwood deployed his K-9 for the sniff and the K-9 indicated to the odor of narcotics.  (TR. 21; Ex. 1.)  Thereafter, the Charger was searched, and the officers located two THC vape cartridges, a small amount of methamphetamine, a used methamphetamine pipe, and approximately five pounds of fentanyl pills which were in a bag found in the trunk.  (TR. 22; TR. 27;  Ex. 2.)

Trooper Harwood took pictures of the rear license plate of the Charger using his cell phone.  (TR. 26-27; Ex. 5; Ex. 6; Ex. 7; Ex. 8.)  Trooper Harwood testified he was attempting to get a picture of the license plate illumination.  (TR. 25-26.)  Trooper Harwood testified he took the pictures approximately ten feet from the vehicle.  (TR. 26; Ex. 8.)  Trooper Harwood stated that at the time he took pictures, he had turned off the cruiser's lights and the flash on his cell phone.  (TR. 26.)  Trooper Harwood testified that Exhibit 8, which shows the Charger's rear license plate, is the closest photo of how the license plate was illuminated.  (TR. 26; Ex. 8.)  Trooper Harwood testified that from this photo, he could not fully see the registration information.  (TR. 26; Ex. 8.)

## DISCUSSION

It is well-established that a "police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." *United States v. Andrews*, 454 F.3d 919, 921 (8th Cir. 2006).  "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair

5

probability that a violation of law had occurred." *Id*. "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001). "The determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999). "Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an objectively reasonable one." *United States v. Herrera–Gonzalez,* 474 F.3d 1105, 1109 (8th Cir. 2007).

In this case, Defendant is only challenging the stop of the vehicle. Trooper Harwood testified he pulled the Charger over because he believed it was in violation of several Utah statutes. First, Trooper Harwood believed Defendant's vehicle did not comply with Utah Code § 41-6a-1604(2)(c), which provides that "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate." Utah Code § 41-6a-1604(2)(c). The government maintains the illumination required by this provision must be enough to allow an individual to clearly see the license plate from 1,000 feet ahead. *See* Utah Code § 41-6a-1603.

Defendant argues the Charger was not in violation of Utah Code § 41-6a-1604(2)(c) because the statute does not require that a license plate be discernible at 1,000 feet ahead. Defendant maintains the 1,000 feet requirement only applies to Utah Code § 41-6a-1603, which requires a vehicle to turn its lights on to be able to see 1,000 feet ahead. Defendant argues Utah Code § 41-6a-1604(2)(c) only requires illumination of the rear plate—it does not require the plate to be visible from a particular distance.

Trooper Harwood also testified he believed that the tint on Defendant's vehicle was darker than permitted under state law. Defendant argues, however, that Trooper Harwood did not have an objectively reasonable belief that the Charger's window tint violated state law. Defendant contends Trooper Harwood could not have determined the window tint was too dark because Trooper Harwood only observed the Charger for a few seconds, and it was dark outside. Defendant points out there was no testimony about a protocol used to evaluate whether a vehicle should be stopped for a window tint violation.

6

The Court has reviewed the evidence and finds that Trooper Harwood had an objectively reasonable belief that a traffic violation had occurred, thus providing probable cause for the traffic stop. Trooper Harwood testified that when the Charger passed him, he suspected that the tint on its windows was too dark under the law. Rather than immediately stopping the Charger, he pulled out onto the roadway near the Charger to verify his suspicion. Following the traffic stop, Trooper Harwood used his tint meter to confirm the Charger's tint was, in fact, in violation of Utah law by ten percent. This is not a situation in which the amount of tint was a borderline violation. Moreover, even if Trooper Harwood had been incorrect in his assessment of the light transmittance before initiating the stop, this does not mean his belief that the Charger was in violation of the law was objectively unreasonable. *See* United States v. Maurstad, 35 F.4th 1139, 1143 (8th Cir. 2022) (finding officer's mistake as to lawfulness of window tint objectively reasonable when the tint was too dark under the statute and there was no way for the officer to know the tint fell within an exception for manufacturer-tinted windows before the stop); United States v. Morgan, No. 17 Cr. 354, 2017 WL 4621632, at *4 (S.D.N.Y. Oct. 12, 2017) ("[I]f an objectively reasonable police officer would have suspected that the windows were tinted in violation of New York law, probable cause can be found, regardless of the individual officer's behavior or beliefs").

Trooper Harwood has been with the Utah State Patrol for ten years and has conducted thousands of stops for window tint violations. He has used a tint meter to measure the tint on windows thousands of times. Based on the facts known to him at the time, as well as Trooper Harwood's experience in this area, Trooper Harwood had an objectively reasonably basis to believe a traffic violation had occurred.[2]

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress Evidence and Statements (Filing No. 203) be denied.

Dated this 9th day of November, 2022.

---

[2] Even if there is some ambiguity in this statute regarding illumination or visibility distance requirements, this issue does not need to be addressed as there was another basis for the traffic stop—the window tint violation.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.